## NORMAN v. BUCKNER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF LOUISIANA.

No. 275. Argued April 16, 17, 1890. — Decided May 19, 1890.

In Louisiana, where the heirs of an intestate may take the property and pay the debts, such an heir cannot, after taking a part of the property, hold the administrator and his sureties responsible for loss in respect to it resulting subsequently thereto; and this rule is not affected by the fact that the administrator, in his individual capacity, afterwards obtained title to and possession of the property thus removed from his custody.

The proceedings attacked in this case were conducted in good faith, and without fraud or collusion.

The facts that the same person was administrator of one estate, and executor of another, and that the testate and the intestate were partners in business, do not affect the right of the creditor of the intestate to have his separate estate applied to the payment of his individual debts, and do not make the sureties on the administrator's bond answerable for waste committed by the executor.

THE case is stated in the opinion.

*Mr. Wade R. Young* for appellants.

*Mr. C. J. J. S. Boatner* for Montgomery, appellee.

*Mr. John T. Ludeling*, for Buckner, appellee, submitted on his brief.

Mr. Justice Brewer delivered the opinion of the court.

This is an appeal from the Circuit Court of the United States for the Western District of Louisiana, dismissing the bill filed by appellants, complainants below. The facts are these:

Complainants are the heirs at law of W. D. King, who died intestate in the State of Louisiana, September 5, 1877. Upon his death and on October 6, 1877, Ben. E. Hall was appointed administrator, and qualified with the defendants and Leonora E. Hall as sureties on his bond. Leonora E. Hall, the surety, was the wife of Ben. E. Hall, the administrator. At the time of his death, King owned an undivided one-half of the "Mounds" plantation, with the personal property attached thereto, and also several hundred acres of wild and overflow lands. Mrs. Hall was the owner of the other undivided half of the Mounds plantation; and she and King were partners in carrying on the plantation, and running a store thereon. On February 19, 1878, the complainants, as heirs of King, sold and transferred to Mrs. Hall the decedent's undivided half of the Mounds plantation, with all the personal property belonging thereto, for the consideration of five thousand dollars and the agreement of the purchaser to pay all the debts of the estate. If Mrs. Hall had carried out her agreement, and paid the debts of the estate, the complainants would have received the overflow lands free from all incumbrances. For the five thousand dollars Mrs. Hall gave two notes, one of two thousand and the other of three thousand dollars, due respectively January 1, 1880, and January 1, 1881, and secured by mortgage on the Mounds plantation. This mortgage was subordinate to a prior mortgage to Aivey & Co., for $17,504.49. Complainants subsequently sold these notes to one of the defendants, John A. Buckner. On September 2, 1879, Mrs. Hall died, leaving a will, giving all her property in Louisiana to her husband, and appointing him her executor. He qualified as such, and gave bond as required by the order of the court. On March 30, 1880, Aivey & Co. commenced suit to foreclose their mortgage; and on November 20, 1880, Buckner, pur-

chaser from complainants of their notes and mortgage, also commenced suit to foreclose. Under the first suit the Mounds plantation was offered for sale on June 19, 1880. At that sale, after some competition, a bid from a reliable person, of thirty thousand dollars, was made. Thereafter, Ben. E. Hall bid thirty-one thousand dollars, and the property was struck off to him. He failed to make good his bid, and the sale was thereupon adjourned; and, subsequently, stayed by injunction proceedings. After those injunction proceedings had been got out of the way, and on June 21, 1884, the property was again offered for sale, and sold to Buckner for twenty-two thousand dollars, an amount not sufficient to discharge the mortgage claims. Pending these proceedings, and on December 11, 1880, Hall, the administrator of King, filed a petition for the sale of the overflow lands, in order to pay debts of the estate. An order for sale was made on this petition, and on February 5, 1881, the property was sold. At the instance of complainants this sale was set aside — they being compelled to advance $1200 to reimburse the purchasers. Thereafter, and on November 16, 1883, another order for sale, on a similar petition, was made, and the property sold to one Isadore Newman, for the sum of $1677.74. The value of this overflow land is alleged by complainants to have been $10,000; and the prayer of the bill is for a recovery against the defendants, the sureties on the administrator's bond, of the sum of $11,200 — being $10,000 as the value of the overflow land and $1200 advanced by complainants on account of the first sale; and failing that, a decree setting aside the sale of the undivided one-half of the Mounds plantation made by them to Mrs. Hall, and requiring the purchaser, John A. Buckner, to return said property to them, with the rents, issues and profits during the time of its possession by him.

The bill has thus a double aspect. The alternative reliefs prayed for are essentially different, one being of an equitable and the other of a legal nature. We will consider that of an equitable nature first.

The prayer of the complainants is, that the contract of sale between them and Mrs. Hall be set aside; and that John A.

Buckner be decreed to return the undivided one-half of the Mounds plantation, which they had sold to Mrs. Hall, and which he had subsequently purchased at mortgage sale. But there is nothing in the record which would justify such relief. Under the laws of Louisiana, the heirs of an intestate may take the property and pay the debts. In pursuance of this right, complainants, the heirs of the intestate King, withdrew the Mounds plantation from the possession of the administrator and sold it. By that act the responsibility of the administrator and the sureties on his bond, as to that property, ceased. The heirs cannot take property from the custody of an administrator, and then hold him or his sureties liable for loss in respect to such property resulting subsequently thereto. Dispossessing him, they relieve both him and his sureties from further responsibility; and this release is in no manner abridged by the fact that the administrator may thereafter, in his individual or in some other representative capacity, obtain the title or possession of the property thus removed from his custody as administrator. The guaranty of an administrator's bond is not against general wrong-doing on the part of the administrator, but simply against his misconduct while in charge of the property of the estate. When that property passes out of his custody, his liability and that of his sureties cease. So when these complainants withdrew the Mounds plantation from the custody of the administrator and sold it on their own account to Mrs. Hall, they released the sureties on his bond from any further liability in respect to it. Neither the administrator nor his sureties owed any duty to the heirs thereafter to look after such property or protect their interests in it. *Hebert* v. *Hebert & Levey,* 22 La. Ann. 308.

Again, there is no pretence that in the sale made by complainants to Mrs. Hall there was any fraud, mistake, or deception. It is not even suggested that there was any wrong in respect to it. How then can they ask to have it set aside? They allege a failure on her part to pay all the consideration. But such failure is no ground for rescission, and they, having parted with the notes received as part payment, cannot return them. Further, while it is alleged that in the fore-

closure sale there was collusion between Buckner the surety, and Hall the administrator, yet the testimony wholly fails to substantiate the claim. The specific charge is, that when the property was offered for sale, a bid from a reliable party was made of thirty thousand dollars, a sum which would have paid off the mortgage debts, and left money enough in the estate of Mrs. Hall to have paid all the debts of her estate, including the obligation, assumed by her as part of the consideration for the Mounds plantation, to pay the debts of the estate of King; that notwithstanding this advantageous bid, Hall bid thirty-one thousand dollars without having the means of making good such bid, and in collusion with Buckner, for the purpose of preventing a sale; that, failing to make good his bid, the sale was first postponed by order of Buckner's attorney, and thereafter stayed by an injunction suit brought by Montgomery and Delony, the other sureties on the bond, and all for the purpose of enabling Buckner to finally acquire title to the plantation at less than its real value. The facts are, as developed by the testimony, that there was no collusion between Buckner and Hall, and no understanding between them in reference to the property; that the foreclosure suits of Aivey & Co. and Buckner were perfectly proper proceedings for the collection of their debts, commenced only after default in payment of interest and principal, and prosecuted in the ordinary way, without undue haste. At the first sale, and that was before Buckner had commenced his foreclosure suit, it is true that the bidding was as alleged; yet Hall's bid was made on his own responsibility, without suggestion from Buckner, and upon what proved to be an unjustifiable expectation that he could arrange with Aivey & Co., or some other parties, for securing the money on the property. When the second sale took place, Buckner was the highest bidder; and this sale was made after the ordinary advertisement, and under no circumstances of oppression or wrong. So far as respects the delay in the sale, caused by the injunction proceedings, it is enough to say that Buckner had nothing to do with that; and, of course, cannot be held responsible for anything that resulted therefrom. The party who had made the

bid of thirty thousand dollars at the first sale, on further examination of the property, and in view of the change of circumstances, did not care to enter into competition at the second sale; and so the property was sold for only twenty-two thousand dollars, an amount which was all absorbed in the mortgage debts. It must also be borne in mind that the foreclosure proceedings were public and judicial; that no party to those proceedings owed any duty in respect thereto to the complainants; and if the mortgage property was worth more than the mortgage debts, and if they had any interest in having it realize its full value, it was their right and duty to attend the sale, and either bid themselves the full value or secure others to make such bid. So, concluding this branch of the case, it is clear that the complainants, as heirs, by withdrawing this property from the custody of the administrator, released him and his sureties from further responsibility in respect to it; that the subsequent taking possession of this property by the administrator, as executor and devisee of Mrs. Hall, the purchaser from the heirs, did not restore the liability of the sureties on his bond; that any wrong practised by him in reference to the property thereafter, was a personal wrong, and one for which his sureties were not responsible; that the foreclosure proceedings were fairly conducted; and that the ill result which followed from Hall's excessive and unfulfilled bid was not the result of any collusion or agreement between him and the surety Buckner, and therefore was not an ill result for which Buckner, as purchaser at the last sale, can be held responsible. In respect to this branch of the case, therefore, the ruling was properly against the complainants.

Passing to the other, it is nothing but an action at law on an administrator's bond, to recover the value of property unnecessarily and improperly sold by him, and damages which resulted from such sale. It is, in no proper sense, a bill for an accounting. It distinctly charges that the administrator twice wrongfully sold the overflow lands; that the complainants succeeded in having the first sale set aside, on the payment of $1200 to the purchasers; that they had no notice of the

second sale, and hence were unable to contest it; and they, therefore, seek to recover the value of the land thus improperly and finally sold, and the $1200 which they had to pay on account of the first sale. But, waiving any question as to whether this branch of the case was improperly joined with that in which a trust was sought to be established in respect to the Mounds plantation, we are of the opinion that the ruling of the Circuit Court was correct on it also, by itself considered. It is indisputable that Mrs. Hall did not pay, as she agreed, the debts of the estate of King; and that the foreclosure sale swept away her entire estate. There remained, therefore, debts due from the estate of King not paid by the heirs, or the purchaser from them of the Mounds plantation. Those creditors had a right to demand the sale of the overflow lands, the remaining property of the estate, for the payment of their claims. The fact that these claims were debts of the partnership of King and Hall, and therefore claims against both their estates; or the additional fact, if it be a fact, that Mrs. Hall's estate if properly managed could have paid these claims, and did not pay them through the mismanagement of her executor; in no manner relieved the estate of King from its liability, or prevented the creditors from having the overflow lands sold to satisfy them. The mismanagement, if conceded by Hall as executor of his wife's estate, in no manner affected the question of the liability of the sureties of Hall, as administrator of the estate of King, for a sale of its property. Whatever personal liability Hall may have incurred by the mismanagement of Mrs. Hall's estate, it is no burden resting upon these defendants as sureties on Hall's bond as administrator of King's estate. No liability arises against them, if there were, in fact, unpaid debts against the estate of King, and the property was sold to pay those debts.

Now, the real contention of complainants is not that there were no unpaid debts of the estate of King, on account of which these lands were sold, but that Mrs. Hall's estate was also liable for these debts; that Hall, as executor, properly managing that estate, could and should have paid those debts out of that estate; and that Montgomery and Delony, two of

the sureties on the administrator's bond, who held these claims, were, by reason of their suretyship, under an equitable obligation to enforce their collection out of Mrs. Hall's estate. But we do not understand that any such obligation was imposed by their suretyship. They did not guarantee Hall's faithful performance of his duty as executor, or become in any manner responsible for what he did as executor. They assumed no obligations in respect to their own claims against the estate of King, either as to the time or manner of their payment. They did not thereby bind themselves to pursue every other joint debtor before asking payment from the King estate. If, by reason of Hall's mismanagement as executor, nothing was left to Mrs. Hall's estate, their claims against the King estate, as one of two joint debtors, were in no manner impaired; and the sale of the overflow lands belonging to the King estate, in satisfaction of their claims, was neither illegal nor improper; and that, in its worst aspect, is all that the testimony develops in respect to this branch of the case.

It should also be noticed that Hall's action in respect to these sales was, in fact, compelled by the complainants themselves. They proceeded against him for contempt in not closing up the estate, and it was only in response to such proceedings that he filed his petitions and made the sales with a view of paying the as yet unpaid debts of the King estate.

Further comment is unnecessary. The decree of the Circuit Court is correct, and it is

*Affirmed.*